**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
DONNA R. DISHBAK, SBN 259311
9777 Wilshire Blvd., 4th Floor
Beverly Hills, CA 90212
Telephone:  (310)-279-5269
Facsimile:  (310)-300-0267
E-mail:      blake@lawbl.com

*Attorneys for Plaintiff Ashley Felton*
*and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY FELTON, an individual, and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SYNAPSE BROKERAGE LLC, a California limited liability company; SYNAPSE FINANCIAL TECHNOLOGIES, INC., JEFFREY ALAN STANLEY, an individual; and MARK ELLIOT PAVERMAN, an individual, SANKAET PATHAK, an individual, DOES 1-10,<br><br>Defendants. | Case No.<br><br><br>**PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT** |

# I. INTRODUCTION

1. This action arises from the deliberate creation of a complex web of affiliated entities including Synapse Financial Technologies, Inc. ("Synapse Fi") and its wholly owned subsidiary Synapse Brokerage LLC ("Synapse Brokerage"), along with key individuals Jeffrey Alan Stanley ("Stanley") and Mark Elliot Paverman ("Paverman"), and Sankaet Pathak ("Pathak") who orchestrated a scheme that transferred customer funds without authorization and operated in violation of regulatory requirements, causing the mismanagement of funds belonging to Plaintiff and Class Members who entrusted cash deposits to one or more banks via use of various financial technology platforms ("FinTechs").

2. FinTechs are a growing sector of technology-based investing, money management, and wealth accumulation platforms, but are not themselves banks – meaning they cannot maintain custody of customer funds. Customer funds have to be maintained at actual banks. In this case, FinTechs used financial companies including Evolve Bank & Trust ("Evolve"), AMG National Trust Bank ("AMG"), and Lineage Bank ("Lineage") for their banking services, and those banks in turn used Synapse Fi to open accounts, process transactions, and manage account statements and ledgers for FinTech companies working with them, and ultimately for their end users.[1]

3. Synapse Fi and Synapse Brokerage, under the direction and control of Stanley, Paverman, and Pathak, failed to adequately monitor, safeguard, and account for Plaintiff's and Class Members' funds in their control, leading to significant ledger discrepancies in account balances. These irregularities were materially

---

[1] Plaintiff filed a case against the financial companies in Case No. 2:24-cv-10317-GW-AJR in this District, which was transferred to the District of Colorado and was consolidated by Court Order into Lead Case No. 1:24-cv-03259-DDD-NRN. The consolidated pleading in Colorado, Dkt. No. 162, specifically contemplates this action and lead counsel in this matter.

1    inaccurate and, as a result, could not be used as the basis for distributing funds
2    to the end users.

3    4. As a result of the Synapse Defendants' acts and omissions, Plaintiff and Class
4    Members had their funds lost, stolen, and/or misplaced, while the Synapse
5    Defendants took no responsibility for their failures. Further, as a consequence
6    of the Synapse Defendants' misconduct, banks have refused to return funds to
7    these end users, leaving thousands of customers, like Plaintiff and Class
8    Members, without access to their funds.

9    5. Synapse Fi filed for Chapter 11 bankruptcy on April 22, 2024, in the Central
10   District of California, Case No. 1:24-bk-10646-MB. On November 12, 2025,
11   the Honorable Martin R. Barash dismissed the bankruptcy case upon motion
12   of Chapter 11 Trustee Jelena McWilliams, who determined that the estate was
13   administratively insolvent and that efforts to sell Synapse Fi's assets yielded
14   no viable bidders. The automatic stay under 11 U.S.C. § 362 terminated upon
15   dismissal. 11 U.S.C. § 349(b). Upon information and belief, Synapse
16   Brokerage was expelled from FINRA membership in June 2025 for failing to
17   maintain required regulatory filings. All claims asserted herein against all
18   Synapse Defendants are no longer subject to any automatic stay.

19                                    **II. PARTIES**

20   6. Plaintiff Ashley Felton ("Felton") is and at all relevant times has resided in the
21   County of Milwaukee, State of Wisconsin. On November 5, 2024, Ms. Felton
22   received an e-mail from support@withyota.com that "according to the
23   Synapse Trial Balance Report, your funds are with Evolve Bank & Trust."
24   Ms. Felton's online Account Statements provide on each and every page:
25   "Banking Services provided by…or Evolve Bank & Trust, Members FDIC."
26   According to the current statement, Ms. Felton had a depository account
27   balance of $7,464.53 on November 5, 2024. In Ms. Felton's online depository
28   account Settings page, the account represents her "Bank Name" as Evolve

1
2
3
4

Bank & Trust. Ms. Felton's funds were managed and processed through Synapse Fi's platform and were subject to the cash management program operated by Synapse Brokerage under the direction of Stanley, Paverman, and Pathak.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

7. Defendant Synapse Financial Technologies, Inc. ("Synapse Fi") is, on information and belief, a California corporation that was the parent and sole owner of Synapse Brokerage LLC. Contrary references in federal regulatory filings, including the Consumer Financial Protection Bureau's August 2025 adversary proceeding, identify Synapse Fi as a Delaware corporation with its principal place of business in Woodland Hills, California. The exact state of incorporation does not affect jurisdiction or venue; if Synapse Fi is a Delaware corporation, CAFA diversity is further strengthened. Synapse Fi operated a technology platform that connected fintech companies and their end users to banking partners including Evolve Bank & Trust and Lineage Bank. Synapse Fi was founded in 2014 and touted itself as the pioneer of the banking-as-a-service ("BaaS") model. It functioned as a middleman between traditional banks and FinTechs. In this role, Synapse Fi opened deposit accounts on behalf of approximately 100 FinTech companies and their end users at four different banks and managed the account ledgers. On April 22, 2024, Synapse Fi filed for Chapter 11 bankruptcy in the Central District of California. As of May 24, 2024, all remaining employees of Synapse Fi were terminated. On November 12, 2025, the bankruptcy case was dismissed by the Honorable Martin R. Barash upon the motion of Chapter 11 Trustee Jelena McWilliams, who found that the estate was administratively insolvent and that no viable bidders could be found for its assets. The automatic stay terminated upon dismissal. Synapse Fi's principal place of business was in San Francisco, California, though the CFPB filings identify Woodland Hills, California.

28

8. Defendant Synapse Brokerage LLC ("Synapse Brokerage") is a California limited

PLAINTIFFS' CLASS ACTION COMPLAINT

liability company that was a wholly owned subsidiary of Synapse Fi. Synapse Brokerage was a former FINRA member that operated a cash management program beginning in September 2023, where customer funds were allocated among multiple banks with the purported goal of maximizing FDIC coverage. Synapse Brokerage was expelled from FINRA membership in June 2025 for failing to maintain required regulatory filings. From September 2023 through May 2024, Synapse Brokerage operated a cash management program where customer funds were supposedly swept from banks like Evolve to multiple "Program Banks" or "Partner Companies" to maximize FDIC coverage, including AMG and Lineage.

9. Defendant Jeffrey Alan Stanley ("Stanley") is an individual who, upon information and belief, resided in San Antonio, Texas during the act and omissions alleged, but may have recently relocated to Parker, Colorado. Stanley served as the functional Chief Executive Officer and supervisory principal of Synapse Brokerage starting in September 2023 and was formally appointed as President and Chief Executive Officer from December 2023 to May 2024. Stanley was responsible for supervising Synapse Brokerage's cash management program and approving customer account openings and fund transfers. Stanley was registered with FINRA through his association with Synapse Brokerage from February 2023 to June 2024.

10. Defendant Mark Elliot Paverman ("Paverman") is an individual who, upon information and belief, resides in the State of New York. Paverman served as the nominal President and Chief Executive Officer of Synapse Brokerage from March 2021 to December 2023, and as Chief Compliance Officer from December 2023 to January 2025. Paverman was responsible for maintaining Synapse Brokerage's books and records and made false representations to FINRA regarding the firm's record-keeping practices and access to books and records. Paverman has over 30 years of experience in senior regulatory and

compliance roles within the financial services industry and holds multiple FINRA registrations.

11. Defendant Sankaet Pathak ("Pathak") is an individual who, upon information and belief, resides in the San Francisco Bay Area, California. Pathak co-founded Synapse Financial Technologies in 2014 and served as its Chief Executive Officer from inception through May 2024. During his tenure, Pathak exercised ultimate decision-making authority over Synapse Fi's operations, strategic direction, banking partnerships, and the cash management program operated through Synapse Brokerage. Pathak oversaw and directed the commingling of customer funds, operational funds, and FinTech partner funds in pooled accounts, approved the BaaS structure that gave rise to the ledger discrepancies at issue herein, and acknowledged in bankruptcy court proceedings that Synapse Fi had blended operational and customer funds. Pathak further took personal loans totaling approximately $320,000 from Synapse Fi in late 2023 and early 2024, during a period when Synapse Fi was insolvent or approaching insolvency and customer funds were at risk. Upon information and belief, Pathak is now a co-founder and CEO of Foundation Future (f/k/a Foundation Robotics Labs), a robotics startup that has raised substantial capital, and holds material equity interests in that entity.

12. Synapse Fi, Synapse Brokerage, Stanley, Paverman, and Pathak, are collectively referred to hereinafter as the "Synapse Defendants."

### III. JURISDICTION AND VENUE

13. This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states. California's long-arm statute, Cal. Code Civ. Proc. § 410.10, authorizes the

PLAINTIFFS' CLASS ACTION COMPLAINT

exercise of jurisdiction on "any basis not inconsistent with the Constitution of this state or of the United States," making the personal jurisdiction inquiry coextensive with federal due process. Because California's long-arm statute extends to the full constitutional limits, the fiduciary shield doctrine has no application here. Due process does not require application of the fiduciary shield doctrine, and that an individual defendant's status as an employee does not somehow insulate him from jurisdiction. Thus, all of the individual defendants' contacts with California—whether made in a corporate or personal capacity—are properly considered in the jurisdictional analysis.

14. Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here, a substantial part of the property that is the subject of this action is situated here, and Defendants are subject to personal jurisdiction in this District. Synapse Fi's principal place of business was in San Francisco, California. Synapse Brokerage is a California limited liability company. The Synapse bankruptcy was venued in the Central District of California, Case No. 1:24-bk-10646-MB, before it was dismissed on November 12, 2025. On information and belief, the FBO accounts holding Plaintiff's funds were located in California, the ledgers and records at issue were created, maintained, and administered from California, the customer account structures were opened and configured from Synapse Fi's California headquarters, and the funds were lost, mis-accounted for, or stolen in the State of California. The FinTech platforms Yotta and Juno, through which Plaintiff and Class Members enrolled and deposited funds, operated their banking platform infrastructure in connection with Synapse from California.

15. Stanley is subject to specific personal jurisdiction in this District under the "effects test" as applied by the Ninth Circuit. Stanley satisfies each element of the three-part purposeful direction test: (1) Intentional Act: Stanley committed intentional acts by approving the opening of over two million

customer accounts without adequate authorization, approving unauthorized transfers of customer funds, and directing the operations of Synapse Brokerage's cash management program. (2) Express Aiming at California: Stanley's tortious conduct was expressly aimed at California because: (a) he voluntarily accepted the position of CEO and supervisory principal of Synapse Brokerage LLC, a California limited liability company, and directed its operations from that position; (b) Synapse Brokerage's sole parent, Synapse Fi, was headquartered in San Francisco, California, and Stanley directed activities through Synapse Fi's California-based infrastructure and personnel; (c) Stanley approved the opening of customer accounts and the transfer of customer funds through account structures that were created, configured, and maintained from Synapse Fi's California headquarters; (d) Stanley's decision to proceed with the cash management program despite warnings was directed at a California entity's operations; (e) the ledger discrepancies Stanley failed to investigate existed between Synapse Fi (a California company) and Partner Companies, with the reconciliation data maintained in California; (f) Stanley approved or permitted the reallocation of over $85 million in customer funds through ledger entries processed by Synapse Fi personnel operating from California; (g) Stanley allowed unregistered Synapse Fi personnel based in California to perform significant brokerage functions; and (h) Stanley directed the operations of a California LLC for approximately two years, during which he was the principal decisionmaker regarding customer funds. These contacts are Stanley's own choice and not 'random, isolated, or fortuitous. (3) Foreseeable Harm in California: Stanley knew or should have known that his tortious conduct would cause harm suffered in California, where the funds were domiciled, the ledgers were maintained, the FinTech platforms operated, and the Synapse entities were organized. Stanley's contacts with California are not based

1    solely on the plaintiff's residence or injuries but arise from Stanley's own
2    affirmative conduct directed at the forum. The "something more" beyond the
3    plaintiff's connection to the forum is Stanley's deliberate direction of the
4    operations of California entities and the use of California-based infrastructure
5    to process unauthorized transfers.
6    16. Paverman is subject to specific personal jurisdiction in this District under the
7    "effects test." (1) Intentional Act: Paverman committed intentional acts and/or
8    acts of negligent misrepresentation by making false representations to FINRA
9    regarding Synapse Brokerage's record-keeping practices and access to books
10    and records, by failing to maintain required books and records, and by serving
11    as the chief compliance officer responsible for regulatory compliance of a
12    California entity. (2) Express Aiming at California: Paverman's conduct was
13    expressly aimed at California because: (a) he voluntarily affiliated himself
14    with Synapse Brokerage LLC, a California limited liability company, over a
15    multi-year period from March 2021 through January 2025, serving first as
16    President and CEO and then as Chief Compliance Officer; (b) his false
17    representations to FINRA in May 2023 concerned the books and records of a
18    California entity—specifically, he falsely stated that Synapse Brokerage had
19    directly contracted with a vendor for record retention and had independent
20    access to its books and records, when in fact the contract was with Synapse Fi
21    (a California corporation) and Synapse Brokerage was dependent on Synapse
22    Fi for access to records maintained in California; (c) his failure to preserve
23    required books and records occurred with respect to a California company's
24    operations, including failing to preserve email communications and electronic
25    communications of Synapse Fi personnel based in California who performed
26    brokerage functions; (d) his misconduct directly impeded regulatory oversight
27    of California-based entities, contributing to the concealment of ledger
28    discrepancies and unauthorized fund transfers originating from California; (e)

1   he was responsible for ensuring the compliance of a California LLC with
2   federal securities laws and FINRA rules, duties he undertook voluntarily and
3   with knowledge of the California nexus; and (f) his false representations to
4   FINRA regarding Synapse Brokerage's access to its California-maintained
5   books and records impeded FINRA's ability to detect the fraud and protect
6   California-domiciled customer funds. (3) Foreseeable Harm in California:
7   Paverman knew or should have known that his misconduct would cause harm
8   in California, where Synapse Fi and Synapse Brokerage operated, where the
9   books and records at issue were generated and maintained, and where
10   customer funds were domiciled. Additionally, Paverman's contacts with
11   California are independently sufficient under a purposeful availment theory
12   because he voluntarily entered into a continuing relationship with a California
13   entity, accepted officer positions in that entity, and derived benefits from that
14   relationship over a period of nearly four years.

15   17.  Pathak is subject to specific personal jurisdiction in this District under multiple
16   independent bases. First, Pathak is a California resident based in the San Francisco
17   Bay Area, and thus is subject to general personal jurisdiction in California. Second,
18   Pathak's tortious conduct was directed at California as Synapse Fi's founder and
19   CEO: (a) Pathak founded Synapse Fi as a California-headquartered company and
20   exercised direction and control over its operations from California for ten years; (b)
21   Pathak's decisions to implement the BaaS model, establish banking partnerships,
22   and authorize the commingling of customer funds were made from and directed at
23   California; (c) Pathak approved the loan of $320,000 from Synapse Fi to himself
24   while Synapse Fi was a California entity operating from California; (d) Pathak
25   directed or approved the operational decisions that led to the $85 million ledger
26   discrepancy and customer fund losses at issue. Third, as pled below, RICO's
27   nationwide service of process provision, 18 U.S.C. § 1965, provides an independent
28   basis for personal jurisdiction. The exercise of personal jurisdiction over Pathak

1    comports with fair play and substantial justice given his California residency,
2    California founding and operation of Synapse Fi, and his central role in the conduct
3    at issue.

4    18. Each of the Defendants named herein acted as a co-conspirator, single enterprise,
5          joint venture, or alter ego of, or for, the other Defendants with respect to the
6          acts, omissions, violations, representations, and common course of conduct
7          alleged herein, and ratified said conduct, aided and abetted, or is otherwise
8          liable. The jurisdictional contacts of one co-conspirator may be attributed to
9          another co-conspirator for purposes of establishing personal jurisdiction.
10         Here, Stanley, Paverman, and Pathak were co-conspirators with Synapse Fi (a
11         California corporation) and Synapse Brokerage (a California LLC), whose
12         undisputed California contacts are properly attributed to the individual
13         defendants. Additionally, upon information and belief, Synapse Fi, Synapse
14         Brokerage, Stanley, and Paverman operated as a single enterprise or alter ego,
15         such that the jurisdictional contacts of the entities should be attributed to the
16         individuals who directed and controlled their operations.

17   19. The exercise of personal jurisdiction over Stanley, Paverman, and Pathak
18         comports with fair play and substantial justice and is reasonable. Seven factors
19         support this conclusion: (a) Stanley, Paverman, and Pathak purposefully
20         injected themselves into California's affairs by voluntarily assuming officer
21         positions at California entities and directing their operations for years; (b)
22         while defending in California imposes some burden on Texas and New York
23         residents, respectively, modern litigation tools mitigate this burden, and both
24         defendants are already subject to FINRA proceedings arising from the same
25         conduct; (c) California has a strong interest in adjudicating disputes arising
26         from the misconduct of officers of California entities that caused harm to
27         funds domiciled in California; (d) the most efficient judicial resolution is in
28         this District, where the related Synapse bankruptcy was venued before its

1   dismissal, where the Felton v. Evolve action is already venued, and where the

2   majority of witnesses and documents are located; (e) California is important

3   to Plaintiff's interest in convenient and effective relief; (f) there is no adequate

4   alternative forum that would have jurisdiction over all defendants and claims;

5   and (g) the Synapse entities are California entities whose operations were

6   centered in California.

7   20. As an independent and alternative basis for personal jurisdiction over Stanley,

8   Paverman, and Pathak, Plaintiff asserts claims under the Racketeer Influenced

9   and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*. RICO's

10  venue and process statute, 18 U.S.C. § 1965, provides an independent basis

11  for personal jurisdiction over all Defendants. Under § 1965(a), this action may

12  be brought in any district where a defendant resides, is found, has an agent, or

13  transacts his affairs. Synapse Fi and Synapse Brokerage are California entities

14  that resided in, were found in, and transacted their affairs in this District.

15  Under § 1965(b), where the court has personal jurisdiction over at least one

16  RICO defendant, it may cause other parties residing in any other district to be

17  summoned and may cause process to be served on any person in any judicial

18  district if the ends of justice require. This provision authorizes nationwide

19  service of process and confers personal jurisdiction over any RICO defendant

20  with minimum contacts with the United States as a whole. Because the Court

21  indisputably has personal jurisdiction over Synapse Fi and Synapse Brokerage

22  (California entities), and because Stanley (a Texas resident) and Paverman (a

23  New York resident) plainly have minimum contacts with the United States, §

24  1965(b) provides an independent and alternative basis for personal

25  jurisdiction over both individual defendants. The "ends of justice require"

26  exercise of this authority because it is not possible to bring all RICO

27  defendants together in a single district through normal jurisdictional channels,

28  and this District is where the RICO enterprise was centered, where the

1  Synapse entities operated, and where the related bankruptcy proceeding was
2  venued before its dismissal on November 12, 2025.

### IV. GENERAL ALLEGATIONS

### Synapse's Role and the Collapse of the BaaS Model

21.    Synapse Fi was founded in 2014 by Pathak and operated a technology platform that connected fintech companies and their end users to banking partners. Pathak, as CEO, exercised ultimate authority over all strategic and operational decisions at Synapse Fi, including the decisions to establish banking relationships with Evolve, AMG, and Lineage, to develop the cash management program through Synapse Brokerage, and to maintain the ledgering architecture that ultimately failed. Synapse Fi opened Demand Deposit Accounts ("DDAs") on behalf of approximately 100 FinTechs and their end users at banks including Evolve Bank & Trust, AMG National Trust Bank, Lineage Bank, and American Bank.

22.    Pathak acknowledged in bankruptcy proceedings that Synapse Fi commingled end user funds, FinTech partner funds, and Synapse's own operational funds in pooled FBO accounts, making it impossible to accurately trace individual customer balances. Pathak was aware of the ledger discrepancies with Evolve by at least September 2023, and despite this knowledge, directed the launch of the Synapse Brokerage cash management program rather than halting operations or disclosing the discrepancies to customers. Pathak further took two personal loans from Synapse Fi in late 2023 and early 2024 totaling approximately $320,000 while these irreconcilable ledger discrepancies existed and Synapse Fi was experiencing severe financial distress. Upon information and belief, these loans constitute fraudulent transfers under applicable federal and state law.

22a. In an October 7, 2024 interview published on YouTube by Fintech Nexus, Pathak publicly admitted to facts that corroborate and amplify the allegations herein. Pathak confirmed that Synapse Fi discovered

irreconcilable ledger discrepancies with Evolve in "late August, early September of 2023," and that despite this knowledge, Synapse proceeded to launch the Synapse Brokerage cash management program rather than halting operations, disclosing the discrepancies to customers, or demanding that Evolve remediate the issues before expanding the program. Pathak's own admissions establish that he had actual knowledge of the ledger discrepancies at the time the brokerage sweep program was launched and that he chose to proceed anyway.

22b. In the same interview, Pathak confirmed the technical architecture through which the ledger discrepancies arose and persisted: Synapse Fi maintained user-level balance data for all end users, while Evolve maintained only the aggregate FBO account balance. Evolve transmitted transaction data to Synapse Fi via automated payment files deposited on a secure file transfer server. Pathak admitted that these payment files from Evolve were repeatedly inaccurate, omitting both incoming credits and outgoing debits from customer accounts, which caused Synapse Fi's user-level ledgers to reflect inflated or otherwise inaccurate balances. Pathak further admitted that when debits were missing from the payment files, customer balances remained artificially inflated — meaning customers believed they held funds that had in fact already been withdrawn — a condition Pathak and Synapse Fi allowed to persist without adequate disclosure or remediation.

22c. In the October 7, 2024 interview, Pathak publicly identified at least three distinct categories of financial breaks that caused or contributed to the ledger discrepancies: (i) missing payment transactions — both credits and debits — that were not transmitted in Evolve's payment files to Synapse Fi, resulting in inaccurate user-level balances; (ii)

1  undisclosed fees charged directly to customer FBO accounts rather than
2  to Synapse Fi's operating accounts, including fees charged by Evolve's
3  payment processor TabaPay at Evolve's direction, and separate
4  "account analysis charges" that Evolve had been assessing against
5  customer FBO accounts since at least 2017 pursuant to a pricing
6  schedule that was never disclosed to Synapse Fi or its customers; and
7  (iii) the Mercury migration discrepancy, in which Evolve granted
8  Mercury unrestricted debit access to an FBO account that was not
9  accurately funded, resulting in Mercury migrating approximately $49
10  million more than it was entitled to withdraw — a figure confirmed by
11  Evolve's own independent investigation and acknowledged by Pathak
12  in the interview.

13  22d. Pathak admitted in the October 7, 2024 interview that Evolve had
14  been covertly soliciting Synapse Fi's fintech customers — including
15  Mercury — since at least 2020, in an effort to position itself as a direct
16  banking-as-a-service provider and disintermediate Synapse Fi. Pathak
17  stated his belief that Evolve induced Mercury to migrate directly to
18  Evolve by threatening to terminate its agreement with Synapse Fi, and
19  that Evolve facilitated Mercury's migration by reassigning account
20  numbers from Synapse Fi's FBO accounts to a separate Mercury-
21  controlled FBO account outside of Synapse Fi's visibility, during which
22  process substantial payments were dropped and never reconciled. This
23  conduct by Evolve directly caused or substantially contributed to the
24  $49 million Mercury discrepancy alleged herein.

25  22e. Pathak further admitted in the October 7, 2024 interview that in
26  September 2023, Evolve withheld approximately $50 million of
27  Synapse Fi's balance sheet in retaliation after Synapse Fi notified

1
2
3
4
5
6
7
8
9
10
11
12

Evolve of the ledger discrepancies, precipitating the financial collapse of Synapse Fi. Pathak stated that he had intended to wind down Synapse Fi's operations and pursue litigation against Evolve using remaining cash reserves, but was dissuaded from doing so by Evolve's representations that it would resolve the discrepancies and cooperate with the TabaPay acquisition. Pathak stated that Evolve ultimately made false representations on the eve of the sale hearing that the accounts had been fully funded, which representations were false. By inducing Pathak to forgo immediate wind-down and litigation, Evolve caused Synapse Fi to exhaust its remaining cash reserves over the following months and ultimately rendered it unable to pursue the very claims that would have benefited Plaintiff and Class Members.

13
14
15
16
17
18
19
20
21
22
23
24
25

22f. Pathak admitted in the October 7, 2024 interview that with the benefit of hindsight, Synapse Fi should have halted all operations and ceased adding new users as soon as it discovered the irreconcilable ledger discrepancies with Evolve, rather than continuing to scale the platform and launching the brokerage sweep program. Pathak acknowledged that the decision to continue operating was driven in part by his belief — which he now recognizes as misplaced — that Evolve would resolve the issues, and in part by a desire to preserve continuity for fintech customers whose businesses depended on the Synapse platform. These admissions establish that Pathak knew the risks to customer funds, had the ability to halt the program, and chose not to do so.

26
27
28

23. Synapse Fi was founded in 2014 and operated a technology platform that connected fintech companies and their end users to banking partners. Synapse

1      Fi opened Demand Deposit Accounts ("DDAs") on behalf of approximately
2      100 FinTechs and their end users at banks including Evolve Bank & Trust,
3      AMG National Trust Bank, Lineage Bank, and American Bank. Beginning in
4      2020, Synapse Fi developed its cash management program in connection with
5      its subsidiary, Synapse Brokerage, through which Synapse began opening
6      Cash Management Accounts ("CMA Accounts") on behalf of the FinTechs
7      and their end users.

8  24. Most end user funds were held in omnibus "For Benefit Of" Accounts ("FBO
9      Accounts") and the remaining funds were held in DDAs across registered and
10     licensed financial partner companies (the "Partner Companies"). In doing so,
11     Synapse combined data received from Partner Companies with its own
12     customer transaction data and delivered that data to the FinTechs. This meant
13     that FinTech users relied on the FinTechs and Partner Companies to account
14     for users' funds; and the FinTechs and Partner Companies, in turn, relied in
15     part on Synapse to keep track of users' funds.

16 25. Starting in approximately 2022, Evolve (referred to as "DDA Bank 1" in
17     regulatory filings) and Synapse Fi maintained ledgers with substantial
18     differences regarding the amount of end user funds held in FBO accounts at
19     Evolve. Synapse Fi's records reflected more end user funds on deposit at
20     Evolve than Evolve claimed to hold.

21 26. By September 2023, faced with the ledgering discrepancy with Evolve, Synapse
22     Fi decided to launch a cash management program through its wholly owned
23     subsidiary Synapse Brokerage to hold end user funds. Stanley, who was
24     functioning as the supervisory principal of Synapse Brokerage, was warned
25     that Synapse Brokerage was not ready for the transition but made the decision
26     to proceed anyway.

27 27. From September 2023 through May 2024, Synapse Brokerage operated a cash
28     management program where customer funds were supposedly swept from

banks like Evolve to multiple "Program Banks" to maximize FDIC coverage. However, the program was fraudulently structured and supervised, with Stanley approving the opening of over two million customer accounts without adequate authorization and Paverman failing to maintain required books and records.

28. Despite representing to customers that funds would be swept to Program Banks, Stanley routinely approved transfers of customer funds back to Evolve and Lineage Bank (referred to as "DDA Bank 2" in regulatory filings) to satisfy minimum balance requirements and other obligations, without customer authorization or knowledge.

29. In April 2024, shortly after Synapse Fi filed for bankruptcy, over $85 million of Synapse Brokerage customer funds were reallocated through ledger entries by unregistered Synapse Fi personnel from Program Banks back to Evolve, without any actual transfer of funds and without customer authorization.

30. As a result of these fraudulent practices, beginning May 11, 2024, Synapse Brokerage customers became unable to withdraw funds from their accounts. Customers whose funds had been reallocated to Evolve have only been able to recover a fraction of their deposits due to the ongoing ledgering discrepancies.

31. On April 22, 2024, Synapse Fi filed for Chapter 11 bankruptcy in the Central District of California. After the bankruptcy filing, it came to light that approximately $85 million in customer funds across 100,000 customers had gone missing. On November 12, 2025, the bankruptcy case was dismissed after the Chapter 11 Trustee determined that the estate was administratively insolvent, no viable bidders could be found for Synapse Fi's assets, and there were insufficient funds to repay creditors. The automatic stay terminated upon dismissal pursuant to 11 U.S.C. § 349(b). As of the date of this Complaint, many end users of Synapse's FinTech partners, including Yotta and Juno,

1    have yet to receive their funds back.

2    32. The bankruptcy process has revealed significant failings, including that Synapse

3        Fi and Synapse Brokerage did not maintain accurate ledgers, leading to

4        incorrect customer fund balances. As a result, many customers have been left

5        unable to access funds and unable to pay essential bills or living expenses.

6                        **Stanley's Misconduct**

7    33. Beginning in September 2023, Stanley, acting as the functional CEO and

8        supervisory principal of Synapse Brokerage, implemented a cash management

9        program that was structurally defective and violated federal securities laws.

10        Stanley approved the opening of over two million customer accounts through

11        "opt-out" notices that did not constitute adequate customer authorization

12        under Exchange Act Rule 15c3-3(j)(2) and FINRA regulations.

13    34. The opt-out notices sent to customers stated that unless customers contacted

14        Synapse Brokerage to opt out, a brokerage account would be opened in their

15        name and their funds would be transferred to the cash management program.

16        Prior to receiving these notices, customers had no knowledge of Synapse

17        Brokerage's existence. Of approximately 90,000 customers who received the

18        notices from one fintech, only about 29,000 opened the email and only 123

19        clicked on the links to review the terms.

20    35. Stanley approved the transfer of customer funds without adequate authorization,

21        including transfers to satisfy minimum balance requirements at Evolve and

22        Lineage Bank that were not disclosed to customers. Stanley was aware by

23        October 2023 that Evolve and Synapse Fi's ledgers could not be reconciled,

24        indicating substantial discrepancies in customer funds, but he failed to

25        investigate these red flags or implement adequate supervisory procedures.

26    36. Stanley violated his supervisory duties under FINRA Rule 3110 by failing to

27        establish and maintain a supervisory system reasonably designed to ensure

28        compliance with applicable securities laws and FINRA rules. Stanley's

violations included: (a) approving the opening of over two million customer accounts without adequate authorization in violation of Exchange Act Rule 15c3-3(j)(2); (b) approving unauthorized transfers of customer funds without adequate customer consent; (c) failing to supervise Synapse Fi personnel who performed brokerage functions without being registered or properly supervised; (d) failing to investigate red flags regarding ledgering discrepancies between Synapse Fi and Evolve; and (e) allowing unregistered personnel to reallocate over $85 million in customer funds through ledger entries without customer authorization.

37. Stanley's representations through opt-out notices sent to customers beginning in July 2023 stated that customer funds would be swept to Program Banks to maximize FDIC coverage, when in fact funds were routinely transferred back to Evolve and other banks without customer knowledge or authorization. Synapse Brokerage represented to customers that all funds above $0.00 in bank accounts would be swept to Program Banks, when in fact Stanley approved transfers of customer funds to satisfy minimum balance requirements at Evolve and Lineage Bank.

**Paverman's Misconduct**

38. Paverman, as Chief Compliance Officer of Synapse Brokerage, failed to maintain required books and records in violation of Exchange Act Rules 17a-3 and 17a-4 and FINRA Rule 4511. Specifically, Synapse Brokerage failed to preserve email communications for three of its registered representatives, failed to preserve instant messages for any personnel, and failed to preserve electronic communications of Synapse Fi personnel who performed brokerage functions.

39. In May 2023, Paverman made false representations to FINRA in an undertaking, falsely stating that Synapse Brokerage had directly contracted with a vendor for record retention and had independent access to its books and records, when

1    in fact the contract was with Synapse Fi and Synapse Brokerage was
2    dependent on Synapse Fi for access to records.

3    40. Paverman's false representations to FINRA impeded FINRA's ability to conduct
4    regulatory oversight of Synapse Brokerage and contributed to the failure to
5    detect and remediate the ledgering discrepancies and unauthorized fund
6    transfers that ultimately caused the loss of customer funds.

7    41. Paverman's failure to maintain proper books and records directly contributed to
8    the inability of customers, regulators, and the bankruptcy trustee to determine
9    the location and amount of customer funds following Synapse Fi's collapse.

10   **Pathak's Misconduct**

11   42.  Pathak, as co-founder and CEO of Synapse Fi from 2014 through May 2024,
12   was the ultimate decision-making authority over Synapse Fi's operations. Pathak's
13   misconduct includes, but is not limited to, the following:

14   a) Pathak founded and operated Synapse Fi's BaaS platform in a manner that
15      systematically failed to maintain accurate, reconciled ledgers of end user
16      funds across its banking partners, which Pathak knew or should have known
17      was essential to the financial safety of customers;

18   b) Pathak directed the launch of Synapse Brokerage's cash management program
19      in September 2023 despite knowing of unresolved and substantial ledger
20      discrepancies with Evolve that indicated tens of millions of dollars of
21      customer funds could not be reconciled;

22   c) Pathak permitted and directed unregistered Synapse Fi personnel to perform
23      brokerage functions, including tracking customer accounts and controlling the
24      ledgers for Synapse Brokerage, without being registered as broker-dealer
25      associated persons under applicable FINRA and SEC regulations;

26   d) Pathak approved or failed to prevent the April 2024 reallocation of over $85
27      million in customer funds through ledger entries by unregistered Synapse Fi
28      personnel following Synapse Fi's bankruptcy filing, which reallocated

customer funds from Program Banks back to Evolve without any actual fund transfer and without customer authorization;

e) Pathak took personal loans totaling approximately $320,000 from Synapse Fi in late 2023 and early 2024, during a period when Synapse Fi was insolvent or approaching insolvency, the ledger discrepancies were known and unresolved, and customer funds were at substantial risk; and

f) Pathak publicly acknowledged commingling of end user funds, FinTech partner funds, and Synapse Fi operational funds in pooled FBO accounts at Evolve, while simultaneously directing the operation of the cash management program and approving the transfer of customer funds without adequate authorization.

43. Pathak's personal liability is not shielded by the corporate form because: (a) Pathak was the primary beneficiary of and personally directed the scheme that harmed customers; (b) Pathak took personal loans from an insolvent entity, constituting fraudulent transfers; (c) Pathak's conduct in permitting commingling of customer and operational funds and directing the BaaS structure that resulted in the loss of customer funds constituted fraud; and (d) adherence to the fiction of the corporate form would sanction fraud and promote injustice. Upon information and belief, Pathak retains substantial personal assets including founder equity interests in Foundation Future (formerly Foundation Robotics Labs), a company that as of early 2026 was seeking to raise up to $500 million at a valuation of approximately $3 billion.

**The Failure to Maintain, Account for, and Provide Access to Customer Funds**

44. Following Synapse's collapse, banks allegedly began reconciling customers' funds and working to correct the materially inaccurate ledgers. Despite these purported efforts, the banks have not accounted for and returned all deposits belonging to FinTech users. Instead, the banks are (1) blaming each other for the inability to unwind Synapse's ledger and fully reconcile missing user

1    funds, and/or (2) asserting that all funds maintained at those banks have been
2    distributed.

3    45. The result is that many customers are left without access to their cash deposits
4    and with no clear ability to discern which bank holds their money, but their
5    money is necessarily held by one or more of the banks and/or was
6    misappropriated by or through the Synapse Defendants.

7    46. The Synapse Defendants' lack of accurate ledgers, lack of contingency planning,
8    and failure to maintain proper books and records all contributed to their
9    failures to fulfill the most fundamental responsibility in financial services: to
10   keep track of the money.

11   **FDIC Insurance Misrepresentations**

12   47. In order to entice the deposit of funds, Plaintiff and Class Members were led to
13   believe their deposits were FDIC insured and protected against all losses.
14   Stanley's representations through Synapse Brokerage's opt-out notices and
15   cash management program materials stated that customer funds would be
16   swept to Program Banks to maximize FDIC coverage, when in fact the
17   program was fraudulently structured and customer funds were not adequately
18   protected.

19   48. On information and belief, FDIC insurance representations were false based on
20   the structure created using FBO accounts. Under 12 C.F.R. § 330.5, FDIC
21   insurance can "pass through" to the beneficial owners of FBO accounts only
22   if: (a) the bank maintains records showing each beneficial owner and their
23   balance; (b) the beneficial owners must be identifiable as having a legal right
24   to the funds; and (c) customers must be notified of the arrangement and their
25   insurance status. The Synapse Defendants' failure to maintain accurate
26   records and their misrepresentations about the nature of the accounts
27   compromised the FDIC insurance coverage that Plaintiff and Class Members
28   were promised.

49. As a result, Plaintiff and the Class could not obtain FDIC insurance of up to $250,000 for each account holder, and their funds were not protected from loss.

## V. CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action on behalf of herself and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following class:

**Nationwide Class: All persons residing in the United States who have been denied access to their funds at any time deposited with, held in the name of, affiliated with, or otherwise designated as held through accounts managed by, processed by, or maintained on the platform or ledgers of Synapse Financial Technologies, Inc. and/or Synapse Brokerage LLC, beginning April 22, 2024.**

51. Excluded from the Class are the Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants have or had a controlling interest.

52. Plaintiff reserves the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

53. **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but upon information and belief, Plaintiff alleges that there are in excess of 100,000 members of the Class.

54. **Typicality.** Plaintiff's claims are typical of those of other members of the

1    Class, all of whom have suffered similar harm due to Defendants' course of
2    conduct as described herein.

3    55.    **Adequacy of Representation.** Plaintiff is an adequate representative of the
4    Class and will fairly and adequately protect the interests of the Class. Plaintiff
5    has retained attorneys who are experienced in the handling of complex
6    litigation and class actions, and Plaintiff and her counsel intend to diligently
7    prosecute this action.

8    56.    **Existence and Predominance of Common Questions of Law or Fact.**
9    Common questions of law and fact exist as to all members of the Class that
10   predominate over any questions affecting only individual members of the
11   Class. These common legal and factual questions include, but are not limited
12   to, the following:

13       a)    Whether Defendants managed, processed, or maintained accounts or
14             ledgers for funds belonging to members of the Class.

15       b)    Whether Defendants were obligated to return funds to members of the
16             Class.

17       c)    Whether Defendants converted and/or refused to return funds
18             belonging to members of the Class.

19       d)    Whether Defendants failed to adequately track, safeguard, and
20             maintain funds belonging to members of the Class.

21       e)    Whether Defendants made false or misleading representations
22             regarding the security and FDIC insurance status of customer funds.

23       f)    Whether Stanley violated his supervisory duties under FINRA Rules
24             and federal securities laws.

25       g)    Whether Paverman failed to maintain required books and records and
26             made false representations to FINRA.

27       h)    Whether Plaintiffs and the Class have sustained damages.

28       i)    Whether Plaintiffs and the Class are entitled to restitution.

1    j) Whether injunctive relief is appropriate and necessary.

2    k) Whether Defendants' conduct was undertaken with conscious

3 disregard of the rights of the members of the Class and was done with fraud,

4 oppression, and/or malice.

5    l) Whether Pathak, as CEO and co-founder of Synapse Fi, directed,

6 authorized, or failed to prevent the conduct that resulted in the loss of Class

7 Members' funds;

8    m) Whether Pathak's personal loans from Synapse Fi constitute fraudulent

9 transfers or preferential payments recoverable for the benefit of the Class;

10   n) Whether the corporate form may be disregarded as to Pathak to reach his

11    personal assets.

12 57. **Superiority.** A class action is superior to other available methods for the fair

13    and efficient adjudication of this controversy because individual litigation of

14    the claims of all members of the Class is impracticable. Requiring each

15    individual class member to file an individual lawsuit would unreasonably

16    consume the amounts that may be recovered. Even if every member of the

17    Class could afford individual litigation, the adjudication of at least tens of

18    thousands of identical claims would be unduly burdensome to the courts. By

19    contrast, the conduct of this action as a class action, with respect to some or

20    all of the issues presented herein, presents no management difficulties,

21    conserves the resources of the parties and of the court system, and protects the

22    rights of the members of the Class.

23       **VI. CAUSES OF ACTION**

24 58. Pursuant to Fed. R. Civ. P. 8(d)(2) and (3), the following causes of action are

25    pled in the alternative to the fullest extent permitted by law. To the extent that

26    any cause of action or allegation herein is determined to be inconsistent with

27    another, Plaintiff pleads each in the alternative. In particular, Plaintiff alleges

28    that the Synapse Defendants' conduct was intentional and fraudulent; in the

alternative, Plaintiff alleges that the same conduct was reckless, grossly negligent, and/or negligent. The inclusion of claims sounding in intentional misconduct is not intended to foreclose the application of claims sounding in negligence, breach of duty, or other non-intentional theories of liability, all of which are independently and alternatively pled.

## FIRST CAUSE OF ACTION
## COMMON LAW FRAUD

(Against All Synapse Defendants)

59.   Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

60. The Synapse Defendants made intentional representations of fact to Plaintiff, the Class, and related parties. These representations included:

a) Essentially continuous representations, from 2020 to May 11, 2024, through the Synapse platform, as to the essentially real-time account balances of customers;

b) Stanley's representations through opt-out notices sent to customers beginning in July 2023 that customer funds would be swept to Program Banks to maximize FDIC coverage, when in fact funds were routinely transferred back to Evolve and other banks without customer knowledge or authorization;

c) Synapse Brokerage's representations to customers that all funds above $0.00 in bank accounts would be swept to Program Banks, when in fact Stanley approved transfers of customer funds to satisfy minimum balance requirements at Evolve and Lineage Bank;

d) Paverman's false representations to FINRA in May 2023 that Synapse Brokerage had directly contracted with a vendor for record retention and had independent access to its books and records;

e) Representations through the Synapse platform and FinTech interfaces

that customer funds were safe, secure, and available for withdrawal on demand;

 f) Representations that customer deposits were FDIC insured and protected, when the Synapse Defendants knew or should have known that the pooled FBO account structure did not comply with 12 C.F.R. § 330.5.

61. These representations were false. In truth: (a) the account balances were false and customer funds were not genuinely accounted for and available; (b) customer funds were not being swept to Program Banks as represented, but were instead being transferred without authorization to satisfy bank obligations; (c) Stanley did not obtain adequate customer authorization before opening brokerage accounts or transferring funds, in violation of federal securities laws; (d) Synapse Brokerage did not have independent access to its books and records as Paverman represented to FINRA; and (e) the record-keeping necessary for FDIC insurance coverage was compromised.

62. The Synapse Defendants knew or, in the alternative, reasonably should have known that their representations were false, material, and would be relied upon by Plaintiff in deciding to deposit and maintain funds through the Synapse platform.

63. If Plaintiff had known the truth about the Synapse Defendants' misconduct, she would have immediately ceased all business with entities utilizing the Synapse platform and taken steps to ensure that her funds were immediately returned.

64. Plaintiff has been damaged by the Synapse Defendants' false representations.

65. The Synapse Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, grossly negligent, and/or conducted in callous and conscious disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages. In the alternative, and to the extent the Synapse Defendants' conduct

was not intentional, it was at a minimum reckless or grossly negligent, constituting a conscious disregard of Plaintiff's rights within the meaning of Cal. Civ. Code § 3294.

## SECOND CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

(Against All Synapse Defendants)

66. Plaintiff repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

67. Synapse Fi, Synapse Brokerage, Stanley, and Paverman conspired and agreed to commit fraud. In furtherance of the conspiracy, among other things, Synapse Fi and Synapse Brokerage, through Stanley, Paverman, and Pathak: (a) made the misrepresentations set forth above; (b) misrepresented customer users' account balances on an essentially continuous basis; (c) misrepresented the transactions that had occurred in end user accounts, as funds had secretly been misappropriated; and (d) misappropriated end user funds. Stanley specifically approved unauthorized transfers of over $85 million in customer funds through ledger reallocations, while Paverman concealed these activities by failing to maintain proper books and records and making false representations to regulators.

68. The Synapse Defendants' misconduct and misappropriation injured Plaintiff and the Class.

69. The Synapse Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, grossly negligent, and/or conducted in callous and conscious disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages. In the alternative, and to the extent the conduct was not the product of an express agreement to defraud, the Synapse Defendants acted with reckless or grossly negligent disregard for the foreseeable consequences of their failures to supervise, investigate, and maintain adequate systems.

1          **THIRD CAUSE OF ACTION**

2          **NEGLIGENT MISREPRESENTATION**

3          (Against All Synapse Defendants)

4   70.    Plaintiff repeats and realleges the allegations set forth in paragraphs above as

5          though fully set forth herein.

6   71.    Plaintiff pleads this claim in the alternative to her common law fraud claim.

7   72. The Synapse Defendants made negligent representations of fact to Plaintiff and

8          the Class. Specifically: (a) through the Synapse platform, the real-time

9          account balances of end users on a daily basis until May 11, 2024; (b) through

10         opt-out notices and cash management program materials, that customer funds

11         would be properly managed and swept to maximize FDIC coverage when

12         Stanley knew or should have known that the supervisory systems were

13         inadequate and that the representations were not supported by adequate

14         investigation or verification; (c) through Paverman's representations to

15         FINRA regarding Synapse Brokerage's record-keeping capabilities when he

16         knew or should have known that the firm lacked independent access to its

17         books and records and failed to exercise reasonable diligence in verifying his

18         representations; and (d) through the FinTech platform interfaces, that

19         customer funds were safe, secure, and available for withdrawal when the

20         Synapse Defendants knew or should have known, through the exercise of

21         reasonable care, that the ledger discrepancies made such representations

22         unreliable.

23  73.    These representations were false or misleading for the reasons stated above.

24  74.    The Synapse Defendants lacked reasonable grounds for believing that their

25         representations were true and failed to exercise reasonable care in ascertaining

26         whether the representations were accurate.

27  75.    Plaintiff actually received the representations at all times when she accessed

28         her online account from 2023 to 2024 that the funds were secured and

29

protected by FDIC insurance, that Evolve was her Bank in the Settings, and that her funds were deposited in the Evolve accounts pursuant to the account summary statements.

76. Plaintiff has been damaged by the Synapse Defendants' false representations in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## CONVERSION

(Against All Synapse Defendants)

77. Plaintiff hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs.

78. Plaintiff and the Class provided hundreds of millions of dollars in customer deposits that were processed through and managed by the Synapse Defendants.

79. The Synapse Defendants intentionally took possession of, transferred, and/or prevented Plaintiff from having access to deposits. Stanley through Synapse Brokerage asserted dominion and control over the deposited funds and approved the unauthorized transfer of over $85 million in customer funds through ledger reallocations.

80. Plaintiff did not consent to the Synapse Defendants' actions.

81. As pled heretofore, there is a sum certain that was misappropriated belonging to Plaintiff of $7,464.53, and the class at least $85,000,000.

82. The Synapse Defendants' actions were willful and malicious, or in the alternative reckless and grossly negligent, in that they failed to credit or return Plaintiff's customer deposits and instead used or permitted the use of the deposits in an unauthorized manner. To the extent the conduct was not intentional, the Synapse Defendants' failures to maintain adequate supervisory systems, investigate known ledger discrepancies, and ensure the return of customer funds constituted a reckless or grossly negligent disregard

1    of their obligations.

2    83.    As a result of the Synapse Defendants' conversion, Plaintiff and the Class

3          have suffered damages and are unable to receive their deposits.

4    84.    The aforementioned conduct was intentional on the part of the Synapse

5          Defendants, to thereby deprive Plaintiff of property and legal rights and

6          otherwise cause injury, so as to justify an award of exemplary and punitive

7          damages.

8                              **FIFTH CAUSE OF ACTION**

9              **VIOLATION OF CALIFORNIA PENAL CODE § 496**

10                        (Against All Synapse Defendants)

11    85.    Plaintiff realleges and incorporates by reference the matters alleged in the

12          foregoing paragraphs of this Complaint as if fully set forth herein.

13    86.    Synapse Fi and Synapse Brokerage are California entities. Synapse Fi's

14          principal place of business was in San Francisco, California. The accounts

15          were created, configured, and administered from California. California Penal

16          Code § 496 applies to the conduct at issue.

17    87.    Pursuant to Cal. Penal Code § 496, the Synapse Defendants knowingly

18          withheld property from end users who were the rightful owners of their cash

19          funds. Stanley, Paverman, and Pathak aided and abetted Synapse Fi in

20          concealing, selling, or withholding property from the owner.

21    88.   The Synapse Defendants' conduct was knowing, or in the alternative reckless,

22          because: (a) Stanley knew or should have known that Synapse Brokerage did

23          not have adequate authorization to open customer accounts or transfer funds;

24          (b) Paverman knew or should have known that Synapse Brokerage's books

25          and records were deficient and made representations to FINRA without

26          adequate investigation or verification; (c) Stanley, Paverman, and Pathak

27          knew or should have known that ledger discrepancies existed between

28          Synapse Fi and Partner Companies by at least September 2023; and (d) both

1    knew or should have known that customer funds would be injured by their
2    misconduct or failures to act.

3    89.   The relief under Cal. Penal Code § 496 is available pursuant to Cal. Penal
4          Code § 496 and *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333
5          (2022).

6    90.   As a result, Plaintiff and the Class have suffered damages in an amount to be
7          established at trial, plus trebled damages and attorney's fees.

8                      **SIXTH CAUSE OF ACTION**
9                      **MONEY HAD AND RECEIVED**
10                     (Against All Synapse Defendants)

11   91.   Plaintiff restates the preceding allegations as if set forth herein.

12   92.   Plaintiff and the Class each registered accounts on one or more platforms that
13         contracted with and utilized Synapse's services. Additionally, many Class
14         members became customers of Synapse Brokerage through the cash
15         management program operated by Stanley.

16   93.   The Synapse Defendants had in their possession or control funds belonging to
17         Plaintiff and the Class. Stanley, through Synapse Brokerage, received and
18         controlled customer funds that were represented to be swept to Program Banks
19         for FDIC coverage maximization.

20   94.   Plaintiff and the Class are the owners, and entitled to possession, of their
21         respective funds.

22   95.   The Synapse Defendants have not returned the funds belonging to Plaintiff
23         and the Class in full.

24   96.   Accordingly, the Synapse Defendants had in their possession money which in
25         equity and good conscience belongs to Plaintiff and Class Members. That
26         money should be refunded to Plaintiff and Class Members.

27                     **SEVENTH CAUSE OF ACTION**
28                     **UNJUST ENRICHMENT**

1       (Against All Synapse Defendants)

2   97.   Plaintiff restates the preceding allegations as if set forth herein.

3   98.   This claim is pleaded in the alternative to Plaintiff's remaining claims.

4   99.   Plaintiff and the Class each deposited funds through platforms that utilized

5         Synapse's services. The Synapse Defendants had in their possession or control

6         funds belonging to Plaintiff and the Class.

7   100.  The Synapse Defendants have not returned the funds belonging to Plaintiff

8         and the Class in full.

9   101.  The Synapse Defendants have been unjustly enriched in retaining and

10        profiting from the cash deposits belonging to Plaintiff and the Class. Stanley

11        specifically approved transfers of customer funds to satisfy minimum balance

12        requirements at other banks, generating profits for those institutions while

13        customers were unaware their funds were being used for such purposes.

14  102.  The Synapse Defendants' retention of this money under the circumstances is

15        unjust and inequitable.

16  103.  As a direct and proximate result of Defendants' misconduct, Plaintiff and the

17        Class are entitled to restitution and disgorgement in an amount to be proven

18        at trial.

19              **EIGHTH CAUSE OF ACTION**

20                  **NEGLIGENCE**

21        (Against All Synapse Defendants)

22  104. Plaintiff restates the preceding allegations as if set forth herein.

23  105. Plaintiff and the Synapse Defendants have a special relationship that gives rise

24        to the Synapse Defendants' duties to Plaintiff and Class Members to act

25        reasonably to: (a) manage, track, and account for cash deposits for Plaintiff's

26        and the Class's benefit; (b) maintain accurate ledgers and records; (c) protect

27        Plaintiff and the Class from unreasonable interference with their right and

28        ability to access their funds; and (d) employ commercially adequate practices

and procedures regarding the accounting and tracking of such funds. Stanley, as the supervisory principal and CEO of Synapse Brokerage, owed specific duties to establish and maintain adequate supervisory systems reasonably designed to ensure compliance with securities laws and to protect customer funds. Paverman, as Chief Compliance Officer, owed specific duties to maintain proper books and records and to make truthful representations to regulators.

106. The Synapse Defendants each breached their duty to Plaintiff and the Class by, among other things: (a) failing to maintain accurate ledgers and records of the location and amount of customer funds; (b) failing to adequately supervise the cash management program and the unregistered Synapse Fi personnel who performed brokerage functions; (c) failing to implement and maintain adequate supervisory systems reasonably designed to ensure compliance with applicable securities laws and FINRA rules; (d) approving the opening of customer accounts and the transfer of customer funds without adequate authorization mechanisms; (e) failing to investigate and remediate known ledger discrepancies between Synapse Fi and Partner Companies; (f) failing to maintain required books and records, including email communications and electronic communications of personnel performing brokerage functions; (g) making representations to regulators without adequate investigation or verification of their accuracy; (h) failing to implement adequate contingency planning to protect customer funds in the event of a system failure or insolvency; and (i) failing to exercise reasonable care in overseeing the operations of Synapse Brokerage and Synapse Fi as they related to the safeguarding of customer funds. These breaches constitute errors, misstatements, misleading statements, acts, omissions, neglect, and breaches of duty by the individual defendants in their capacities as officers of Synapse Brokerage.

107. The harms inflicted upon Plaintiff and Class members were reasonably foreseeable. The Synapse Defendants were aware that consumers relied upon financial platforms to store and safeguard cash deposits and provide prompt access to cash deposits.

108. As a direct and proximate result of the Synapse Defendants' failures described herein, Plaintiff and the Class have been deprived of their cash deposits, access to cash deposits, and accrued interest thereon.

109. Plaintiff and the Class have also suffered emotional distress, anxiety, and fear upon being notified that their accounts were frozen and cash balances inaccessible and/or misplaced.

110. Plaintiff, on behalf of herself and the Class, seeks damages and interest thereon in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

(Against All Synapse Defendants)

111. Plaintiff restates the preceding allegations as if set forth herein.

112. As the managers and custodians of the account platform and ledger system through which customer funds were tracked and allocated, the Synapse Defendants owed a fiduciary duty to Plaintiff and the Class to maintain, safeguard, and accurately account for their cash deposits. Stanley, through his role at Synapse Brokerage, owed fiduciary duties to customers to properly manage their funds in the cash management program and to ensure adequate supervision of fund transfers and account management. Paverman owed fiduciary duties to maintain accurate books and records.

113. Plaintiff and the Class entrusted the Synapse Defendants to ensure the safekeeping and accurate accounting of their assets.

114. As alleged above, the Synapse Defendants breached their fiduciary duties of care and loyalty to Plaintiff and the Class. The Synapse Defendants failed to

maintain accurate ledgers, failed to employ reasonable measures to verify the accuracy and amount of account balances, failed to properly account for or provide access to funds, failed to exercise reasonable diligence in supervising the cash management program, failed to investigate known red flags regarding ledger discrepancies, and made representations to regulators without adequate verification that impeded oversight. These breaches include failures to exercise the degree of care, skill, and diligence that a reasonably prudent officer in a like position would exercise under similar circumstances.

115. As a result of the foregoing actions of the Synapse Defendants, Plaintiff and the Class have been damaged in an amount to be proven at trial. Plaintiff seeks all available remedies including general damages, special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

<h3 style="text-align:center"><u>TENTH CAUSE OF ACTION</u></h3>
<h3 style="text-align:center"><u>ACCOUNTING</u></h3>

(Against All Synapse Defendants)

116. Plaintiff restates the preceding allegations as if set forth herein.

117. Plaintiff and the Class each registered accounts on one or more platforms that contracted with and utilized Synapse's services. Plaintiff and the Class each deposited funds through platforms utilizing Synapse's services.

118. The Synapse Defendants had in their possession or control funds belonging to Plaintiff and the Class, or maintained the ledgers and records necessary to determine the location and amount of such funds.

119. The Synapse Defendants have not returned the funds belonging to Plaintiff and the Class in full.

120. The Synapse Defendants have failed to provide an accounting and/or sufficient information and documentation concerning the amount and location of Plaintiff's and the Class's funds. This failure is particularly egregious given Paverman's failure to maintain proper books and records at Synapse

1    Brokerage and his false representations to FINRA regarding the firm's record-
2    keeping capabilities.

3  121.  Plaintiff and the Class are entitled to an accounting as it pertains to the amount
4    and location of their funds.

5  122.  A remedy at law is inadequate because, without an accounting, Plaintiff and
6    the Class are unable to verify the extent of damage incurred as a result of the
7    Synapse Defendants' wrongdoing.

8    **ELEVENTH CAUSE OF ACTION**
9    **RICO ENTERPRISE VIOLATION — 18 U.S.C. § 1962(c)**
10    (Against Stanley, Paverman, and Pathak)

11  123.  Plaintiff incorporates by reference each and every allegation in the preceding
12    paragraphs as though fully set forth herein.

13  124.  Section 1962(c) of RICO provides that "it shall be unlawful for any person
14    employed by or associated with any enterprise engaged in, or the activities of
15    which affect, interstate or foreign commerce, to conduct or participate,
16    directly or indirectly, in the conduct of such enterprise's affairs through a
17    pattern of racketeering activity."

18  125.  Stanley, Paverman, and Pathak are each a "person" within the meaning of 18
19    U.S.C. § 1961(3).

20  126.  The RICO Enterprise: Synapse Fi, Synapse Brokerage, and their officers and
21    agents (including Stanley, Paverman, Pathak, and other Synapse Fi personnel
22    who performed brokerage functions) constituted an association-in-fact
23    "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").
24    The Enterprise is distinct from the "persons" who conducted its affairs. The
25    Enterprise was engaged in and its activities affected interstate commerce
26    through: (a) the processing and transfer of customer deposits across state lines
27    through the federal banking system; (b) interstate wire communications used
28    to transmit false account balances and misrepresentations to customers

nationwide; (c) relationships with FDIC-insured banks in multiple states including Arkansas, Tennessee, Colorado, and Pennsylvania; and (d) the operation of a nationwide cash management program affecting customers in all fifty states.

127. Structure and Roles of the Enterprise: The Enterprise operated through a defined structure with distinct, complementary roles for each participant: (a) Synapse Fi served as the technology platform and operational hub that maintained the ledger system, processed transactions, and controlled customer account data from its California headquarters; (b) Synapse Brokerage served as the vehicle through which the cash management program was operated, customer accounts were opened, and customer funds were transferred; (c) Stanley, as CEO and supervisory principal of Synapse Brokerage, served as the primary decision-maker who approved unauthorized account openings, directed unauthorized fund transfers, and failed to investigate red flags; and (d) Paverman, as CCO and former CEO of Synapse Brokerage, and Pathak CEO of Synapse, served as the compliance gatekeeper who concealed the Enterprise's deficient record-keeping from regulators through false representations to FINRA and failures to preserve required books and records.

128. Pattern of Racketeering Activity: Stanley, Paverman, and Pathak conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of multiple predicate acts of wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), including but not limited to:

   a) Predicate Act 1 — Wire Fraud (Opt-Out Notices): Beginning in July 2023, Stanley caused Synapse Brokerage to transmit opt-out notices via electronic mail to approximately 90,000 customers, falsely representing that customer funds would be swept to Program Banks to maximize FDIC coverage. These notices were transmitted through interstate wire

1   communications and contained material misrepresentations designed to

2   induce customers to acquiesce in the transfer of their funds to Synapse

3   Brokerage's cash management program. Stanley knew or reasonably

4   should have known that the cash management program lacked adequate

5   authorization mechanisms, that funds would be used to satisfy bank

6   minimum balance requirements rather than maximizing FDIC

7   coverage, and that the supervisory systems were inadequate;

8   b) Predicate Act 2 — Wire Fraud (False Account Balances): From 2022

9   through May 11, 2024, the Enterprise transmitted false account balance

10  information to customers through the Synapse platform and FinTech

11  interfaces via interstate wire communications, representing that

12  customer funds were safely held and available for withdrawal when in

13  fact substantial funds had been misappropriated, misplaced, or could

14  not be accounted for due to ledger discrepancies between Synapse Fi

15  and Partner Companies;

16  c) Predicate Act 3 — Wire Fraud (FDIC Insurance Misrepresentations):

17  Throughout the Class Period, the Enterprise caused false

18  representations regarding FDIC insurance coverage to be transmitted to

19  customers via interstate wire communications through account

20  statements, website pages, and account interface screens, representing

21  that customer deposits were "FDIC Insured backed by the full faith and

22  credit of the United States Government" when the Enterprise knew or

23  reasonably should have known that the pooled FBO account structure

24  did not comply with 12 C.F.R. § 330.5 and that FDIC insurance

25  coverage was compromised;

26  d) Predicate Act 4 — Wire Fraud (Unauthorized Fund Transfers): From

27  September 2023 through April 2024, Stanley approved or directed the

28  transfer of customer funds through the federal banking system's

interstate wire transfer network from Program Banks back to Evolve and Lineage Bank to satisfy minimum balance requirements, without customer authorization or knowledge, using false pretenses and misrepresentations about the purpose and destination of customer funds;

e) Predicate Act 5 — Wire Fraud ($85 Million Reallocation): In April 2024, following Synapse Fi's bankruptcy filing, unregistered Synapse Fi personnel, under the supervision and with the approval or acquiescence of Stanley and Pathak, caused over $85 million in customer funds to be reallocated through ledger entries from Program Banks back to Evolve via interstate electronic communications, without any actual transfer of funds and without customer authorization;

f) Predicate Act 6 — Wire Fraud (Paverman's False Representations to FINRA): In May 2023, Paverman transmitted false statements to FINRA via interstate wire communications, falsely representing that Synapse Brokerage had directly contracted with a vendor for record retention and had independent access to its books and records, when in fact the contract was with Synapse Fi and Synapse Brokerage was dependent on Synapse Fi for access to records. These representations, which were false and made without adequate investigation or verification, had the effect of concealing the Enterprise's failure to maintain adequate books and records and to impede FINRA's regulatory oversight.

129. Relatedness: Each of the predicate acts described above was related to the others as part of a common scheme and plan to defraud customers of their deposited funds, conceal ledger discrepancies, and maintain the flow of customer deposits into the Enterprise's cash management program.

130. Continuity: The pattern of racketeering activity satisfies both closed-ended and

1  open-ended continuity. Closed-ended continuity is established by the
2  extended period of the scheme (from at least 2022 through May 2024), the
3  large number of victims (over 100,000 customers), and the substantial amount
4  of money involved (over $85 million). Open-ended continuity is established
5  because the Enterprise's conduct constituted a regular way of doing business
6  — the systematic misrepresentation of account balances, unauthorized
7  transfers of customer funds, and concealment of regulatory deficiencies were
8  not isolated incidents but the Enterprise's ongoing modus operandi.

9  131. Plaintiff has been injured in her business and property by reason of the above-
10  described violations. By reason of her injury, Plaintiff is entitled to recover
11  threefold the damages she has sustained, plus the cost of this suit, including
12  reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

13  **TWELFTH CAUSE OF ACTION**
14  **RICO CONSPIRACY — 18 U.S.C. § 1962(d)**

15  (Against Stanley, Paverman, and Pathak)

16  132. Plaintiff incorporates by reference each and every allegation in the preceding
17  paragraphs as though fully set forth herein.

18  133. Section 1962(d) provides that "it shall be unlawful for any person to conspire
19  to violate any of the provisions of subsection (a), (b) or (c) of this section."

20  134. Stanley, Paverman, and Pathak violated § 1962(d) by conspiring to violate 18
21  U.S.C. § 1962(c). Stanley, Paverman, and Pathak agreed, explicitly or
22  implicitly, that they or others would commit at least two predicate acts in
23  furtherance of the Enterprise's affairs. Specifically: (a) Stanley, Paverman,
24  and Pathak each knew or should have known that the Enterprise would
25  transmit false account balance information and FDIC insurance
26  representations to customers via interstate wire communications; (b) Stanley
27  knew or should have known that customer funds would be transferred without
28  authorization through the federal banking system; (c) Paverman knew or

1    should have known of and failed to prevent the concealment of the

2    Enterprise's regulatory deficiencies from FINRA by making false

3    representations and failing to maintain required records; and (d) both Stanley,

4    Paverman, and Pathak knew or should have known of the need to investigate

5    or remediate the ledger discrepancies that threatened customer funds.

6  135. In furtherance of the conspiracy, Stanley, Paverman, and Pathak committed and

7       caused to be committed the overt acts described in the preceding paragraphs.

8  136. Plaintiff has been injured in her business and property by reason of the above-

9       described conspiracy. By reason of her injury, Plaintiff is entitled to recover

10      threefold the damages she has sustained, plus the cost of this suit, including

11      reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

12              **THIRTEENTH CAUSE OF ACTION**

13                 **CONSTRUCTIVE TRUST**

14              (Against All Synapse Defendants)

15  137.  Plaintiff restates the preceding allegations as if set forth herein.

16  138.  Plaintiff and the Class each registered accounts on one or more FinTech

17        platforms that contracted with and utilized Synapse's services. Plaintiff and

18        the Class each deposited funds through platforms utilizing Synapse's services.

19  139.  The Synapse Defendants had in their possession or control funds belonging to

20        Plaintiff and the Class. The Synapse Defendants have not returned the funds

21        belonging to Plaintiff and the Class in full.

22  140.  Equity and justice require that the Synapse Defendants be deemed to hold

23        these funds in constructive trust for Plaintiff and the Class.

24  141.  Plaintiff and the Class are entitled to imposition of a constructive trust upon

25        any accounts or assets held by the Synapse Defendants which contain funds

26        belonging to Plaintiff and the Class.

27              **VII. PRAYER FOR RELIEF**

28  WHEREFORE, Plaintiff, individually and on behalf of the proposed Class,

1    respectfully prays for the following relief:

2        a) Certification of this case as a class action on behalf of the proposed

3           Class and any subclasses defined above, appointment of Plaintiff as

4           Class representative, and appointment of her counsel as Class

5           Counsel;

6        b) An award to Plaintiff and the proposed Class of restitution and/or

7           other equitable relief, including, without limitation, restitutionary

8           disgorgement;

9        c) An injunction ordering the Synapse Defendants to cease the business

10           practices complained of herein;

11        d) An award of all economic, monetary, actual, consequential, and

12           compensatory damages caused by the Synapse Defendants' conduct;

13        e) An award of nominal, punitive, exemplary, trebled, and statutory

14           damages where available;

15        f) Reasonable expenses and attorneys' fees;

16        g) Appointment of a receiver, custodian, or trustee over any remaining

17           Synapse Defendant assets;

18        h) An accounting as to all the amounts owed to the Class;

19        i) An accounting as to all outstanding custodial obligations, liabilities,

20           and assets;

21        j) That a constructive trust be imposed upon any accounts or assets held

22           by the Synapse Defendants which contain funds belonging to Plaintiff

23           and the Class;

24        k) Pre- and post-judgment interest, to the extent allowable; and

25        l) For such further relief that the Court may deem just and proper.

26

27

28

1    Date:    March 5, 2026

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LINDEMANN LAW FIRM, APC
BLAKE J. LINDEMANN


By:  /s/ *Blake J. Lindemann*
        Blake J. Lindemann


*Attorneys for Plaintiff Ashley Felton*
*and the Proposed Classes*

1

## **DEMAND FOR JURY TRIAL**

2         Plaintiff, on behalf of herself and those similarly situated, demands a jury

3    trial on all issues so triable.

4

5    Date:    March 5, 2026                    LINDEMANN LAW FIRM, APC
                                               BLAKE J. LINDEMANN
6

7                                              By:  /s/ *Blake J. Lindemann*
                                                    Blake J. Lindemann
8

9                                              *Attorneys for Plaintiff Ashley Felton*
                                               *and the Proposed Classes*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CLASS ACTION COMPLAINT